JOHN W. SCOTT, plaintiff in error, *v.* BETSEY MOORE, impleaded, &c., *et al.*, defendants in error.

*Error to Madison.*

Where a bill was filed by an heir, to set aside a conveyance made by the heirs of her guardian, on the ground that the premises conveyed by the heirs, were purchased by the guardian, with the funds of the complainant, and it appeared that the father of the complainant purchased the premises at the proper land office of the United States, and died in possession thereof, but, nevertheless, a patent was issued by the United States to another person: *Held,* that it was not necessary that the patentee, or those to whom he had conveyed, should be made parties to the bill, as it was filed to enable the complainant to bring an action of ejectment against the person in possession of the premises; and that sufficient title was shown by the heir, to authorize her to file the bill.

It is the peculiar province of a court of equity, to administer to the ends of justice, by removing impediments to the fair decision of a question in other courts, by preventing injury to persons, from the doubtful title of others, which may be set up, and to prevent an unnecessary multiplicity of suits.

As a general rule in equity, all persons materially interested in the subject of the suit, however numerous, ought to be made parties, that there may be a complete decree. This rule is confined to parties to the interest involved in the issue, and who must necessarily be affected by the decree. And it is more a rule of convenience than of right, and is dispensed with when it becomes extremely difficult or inconvenient to pursue it.

A party who claims an estate in land by a paramount title, ought not to be made a defendant to a bill in chancery to set aside, as fraudulent, a conveyance of the same premises, from another person.

Where a bill in chancery alleged that the defendant purchased a tract of land with notice of the complainant's equity, and called upon the defendant to state what was the consideration he paid for the same, and he answered that it was a full and valuable consideration, without stating what it was, or how much, but the consideration expressed in the deed, which was a quitclaim, was $500: *Held,* that the Court would presume that the consideration mentioned in the deed was not the actual one.

Where A died intestate, leaving a wife and daughter, and B was appointed his administrator, and B, as guardian of the daughter, foreclosed a mortgage executed by C to A, in the name of the daughter, as the heir of her father: *Held,* that B was estopped to deny that the mortgage belonged to the daughter, and B could not set up a claim to it as administrator.

Where B, the administrator of A, foreclosed a mortgage in the name of the only child of A, as heir, and upon the sale of the mortgaged premises, purchased the same, for the consideration of $1000, and the sheriff's deed recited the fact that the sale was made to B, under proceedings by *scire facias* to foreclose the mortgage, in the name of the heir, and the deed was recorded in the proper county: *Held,* that this was notice to a purchaser of B's heirs, of the facts stated in the deed : *Held,* also, that as the same proceedings showed that B was the guardian of the heir, they were notice that he was trustee of the avails of those proceedings, whether the land itself, or the money in lieu thereof.

*o*

A bill in chancery alleged that the complainant was the only heir of A; that at the time of A's decease, he held a mortgage upon certain premises, which was subsequently foreclosed in the name of the heir, by B, her guardian and next friend, and the premises purchased, at the mortgage sale, in the name of B, as guardian, for $1000; that B never paid the $1000, or any part thereof, but had the amount of his bid credited on the mortgage debt, and never paid any part thereof to the complainant; that the heirs of B conveyed the premises to C, who knew that B never paid any thing on said purchase. The answer denied any such knowledge, or any notice of any such facts, and averred that B purchased in his own right. The proof showed that after A's death, B was appointed administrator of his estate, and also guardian of the complainant; that B was poor, and could not have paid the tenth part of $1000, out of his own funds; that he had scarcely clothes enough to wear; that B never made any settlement, or rendered any account of his guardianship. That the defendant resided in the neighborhood of B, and was constable and deputy sheriff of the county, not long before the sale; that it was generally believed in the neighborhood, that B did not pay the purchase money; that any stranger coming into the neighborhood could see his situation; that the defendant was a man of penetrating mind, and used to make enquiries about any business he entered into; that he had subsequently conversed about his title to the premises, and expressed doubt of the same: had said that if he was a single man, he would go and marry the complainant, and then he would be sure of the land; but he thought his title under B, as good as any of the titles; that the defendant said he had bought the title of the former husband of the complainant, and he thought that title was the best chance; that the defendant had given his note for $200, for the use of the infant son of the complainant, payable as soon as he should obtain a legal title to the premises, from the legal representatives of the estate of A: *Held,* that these facts showed that the defendant was placed in a position to know all the material facts attending the purchase of the land by B, and was chargeable with notice: *Held,* also, that whether the mortgage was a chattel which passed to B, as administrator, or descended to the heir, was immaterial, as, in either case, B was a trustee for the complainant, there being no creditors; and there was a resulting trust in her favor.

The proof also showed that the mother of the complainant, after the decease of A, made a bequest to B, in the following words: "I bequeath all my part of the estate to B, with all its profits and emoluments, together with my stock of five cows, &c.": *Held,* that B, by foreclosing the mortgage in the name of the complainant, was estopped (together with those claiming under him) from making any claim to the land, under this bequest.

THIS cause was heard in the Court below, at the September term, 1841, before the Hon. Sidney Breese. The facts are stated in the opinion of the Court.

W. MARTIN, for the appellant, contended that a mortgage was a mere incident to the debt—a mere collateral security; that until the mortgage was foreclosed, the nature of the estate of the mortgagor was not changed; that the recording of deeds only related to those tracts of lands, the title to which is out of Government; that the recording of a deed is not constructive notice, where the title is in the Government; that Hunter was a necessary party to this proceeding. He cited Russell *v.* Clark's Ex'rs., 2 Peters' Cond. R. 426; 2 Hen. & Munf. 261–5; 4 Hen. & Munf. 430; 2 Powell on Mort., 662–7, and notes.

LYMAN TRUMBULL and J. GILLESPIE, for the appellees, contended that it was immaterial to Easton, which of the parties before the Court had title to the land; that it was not alleged in the bill, nor set up in the answer, that there was any outstanding title; that neither Easton nor Hunter were necessary parties to the bill.

Story's Eq. Plead., 198 § 230; 1 Peters 306; 1 Johns. Ch. R. 348–9; 8 Peters 532.   That it was immaterial whether the mortgage was personal or real estate; that in either event it was the estate of the heir.   That the will of Nancy Bates gave nothing to Levi Crosby, except two horses in the codicil; that the will was not properly proved, under the act of 1819.   That a person with notice, stands in the same relation, as the trustee; that Scott had notice that Crosby was the guardian, by the record.   That a *lispendens,* duly prosecuted, is a notice to a purchaser; that if a purchaser has notice of a trust, he takes subject to it.   Murray *v.* Ballow, 1 Johns. Ch. R. 566.   They also cited 9 Peters 483; 10 Peters 177; 2 Sug. on Vend. 122–3, 139, 149, 174; 4 Porter 283; 2 Johns. Ch. R. 252; 10 Verm. 429.

BREESE, Justice, delivered the opinion of the Court:

The bill filed in this cause alleges that the complainant, Betsey Fears, is the daughter and only heir at law of John Bates, who died intestate, about the year 1821.   That he was seized in his life time, of an indefeasible estate in fee simple, in and to the northwest fractional quarter of section thirteen [13], in township five [5] north, range ten [10] west of the third principal meridian, containing one hundred and fourteen acres, more or less.   That being so entitled, he, with Nancy Bates, his wife, on the 2d day of March, 1818, sold and conveyed it to Joseph Meacham, by deed duly acknowledged and recorded, for the sum of $3900, and to secure that sum, Meacham, on the same day, by a deed duly acknowledged and recorded, mortgaged it to Bates; the last payment of $900 to be made in three years from that date.   That after the death of Bates, at the April term, 1822, of the Madison Circuit Court, suit was instituted upon the mortgage, in the name of Betsey Bates, by Levi Crosby, her guardian; that judgment was rendered in said suit, and the premises ordered to be sold, to satisfy the amount then due upon the mortgage, being the sum of $3000 and upwards; that a *levari facias* issued on the judgment, and the premises were struck off " to the said Levi Crosby, guardian as aforesaid," for the sum of $1000.

The bill then charges that the said Crosby never paid the $1000, or any part thereof, but had the amount of his bid credited on the mortgage debt, and that she has never received any part of it, nor did Crosby ever account to her for that money, or any part thereof; " but said purchase was made with, and paid for out of, the funds of complainant, then a minor."

The bill then alleges the execution of a deed by the sheriff of Madison county to Crosby, on the 27th of July, 1822, for the land; the death of Crosby in the year ——, leaving certain children his heirs at law, who, by quit claim deed, bearing date in April, 1836, conveyed all their right, title, and interest in and to the lands, to John W. Scott, the defendant; and charges that Scott,

when he purchased of the heirs of Crosby, well knew that Crosby never paid the $1000, nor any other sum, as the consideration of the deed from the sheriff of Madison county to him, but that the purchase was made with the funds of complainant; and charges that Scott was informed, or had some knowledge that the purchase by Crosby was made with those funds. The bill then states that the premises are in the possession of Charles W. Hunter and others, to eject whom, she is about to institute an action of ejectment, which she cannot do, while the title remains in Scott. Interrogatories are propounded to Scott, based on the charges in the bill, and answers required. The prayer is, that Scott may be decreed to convey to the complainant, all the right, title, and interest in and to the premises, which he has derived from the heirs of Crosby, by their deed executed to him, and for general relief, and also for process to issue, &c.

At the August term of the Madison Circuit Court, Scott answered; exceptions were taken to the answer, and allowed; and, at the same term, the intermarriage of complainant with Archibald D. Moore, was suggested on the record, and time allowed Scott, until the next February term, to file a perfect answer.

The amended answer was duly filed, waiving the original answer, which it is not necessary, therefore, to notice, and admits that the complainant is the daughter of the John Bates named in the bill, but does not know positively that she is the only heir at law of John Bates; neither admits nor denies the death of Bates in 1821, his being seized in his life time, of the land mentioned in the bill, or the contents of the tract; does not deny the conveyance by Bates and his wife, to Joseph Meacham, nor the conveyance by mortgage deed from Meacham to Bates; cannot state whether Crosby was or not the guardian of the complainant; refers to the proceedings on the *scire facias* to foreclose the mortgage, which state that he acted for her as her guardian and next friend, which he makes part of his answer; admits the sale of the land under the judgment on the mortgage, by the sheriff, to Crosby, and avers that the $1000 bid by him, was the full value of the land, at the time of the sale. It alleges that Crosby purchased it in his own right, at public vendue, for his own use and benefit; acknowledges the execution of the deed by the sheriff to Crosby, and denies all knowledge whatever, either direct or indirect, out of what funds, or with whose funds, Crosby paid for the land, or whether it was credited to the mortgage; refers to the sheriff's deed as proof that he received the $1000 from Crosby, on the sale of the land; cannot state whether the complainant ever received any part of it, as he knew nothing of her, or of Crosby, at the time the land was sold; neither admits nor denies, that the land was purchased with the funds of the complainant, then a minor, as charged in the bill; admits the death of Crosby, and the heir-

ship of his children, as charged, and the execution, by them, of a deed to him, for the land in 1836; states that it was purchased for a full and valuable consideration paid by him to the heirs, at the time their conveyance was made; that he purchased in good faith, and for a good and valuable consideration, and without any knowledge, direct or indirect, that Crosby had become the purchaser as guardian of the complainant, or that he had not paid any consideration for the land, as charged; believes that the allegations in the bill, on those heads, and those charging Crosby with making the purchase with complainant's funds, and without paying a full and valuable consideration therefor, to be utterly untrue; alleges that Crosby did pay the sum of $1000, as the consideration, and that his heirs had a good right to sell and convey to him; denies any knowledge that the land was purchased by Crosby, with the money or effects of the complainant, and all unlawful combination and confederacy, &c.

A general replication was put in to the answer, and the cause set for hearing at the next September term.

At the hearing, the complainant introduced as evidence,

*First.* The certificate of the register of the land office at Edwardsville, dated the 25th of September, 1841, showing that one Andy Dunnegan did, on the 19th of August, 1814, enter in the land office at Kaskaskia, where said lands were then subject to entry, fractional section thirteen [13], township five [5], north of the base line, in range ten [10], west of the third principal meridian, and that he paid for the same.

*Second.* A deed from A. Dunnegan and wife, to John Bates, dated the 5th of October, 1814, and recorded on the 28th of February, 1815, conveying this land to him.

*Third.* A deed from John Bates, and Nancy, his wife, to Joseph Meacham, with covenants of general warranty, dated March 2d, 1818, and recorded March 10th, 1819, for the same land, in consideration of the sum of $3900.

*Fourth.* A mortgage deed of the same date from Meacham to Bates, to secure the payment of this sum, of the same land, recorded March 23d, 1818.

*Fifth.* The deposition of Jacob Deek, which states that he has known Betsey Moore, the complainant, ever since she was a child, being some twenty-one or twenty-two years; that she is the only heir of John Bates, as he knows of his own personal knowledge, having been at Bates' marriage, and at his house at the birth of Betsey, and having known Mr. and Mrs. Bates up to the time of their death. He also states that John Bates resided on the land in controversy, at the time of his decease; and that it was generally understood that he had purchased and paid for it.

*Sixth.* The depositions of Abel Moore, Solomon Pruitt, and William Montgomery, establishing the same facts, the death of

John Bates; seizen at the time of his death, and heirship of complainant.

*Seventh.* The records of the County Commissioners' Court of Madison county, of the March term, 1820, appointing Levi Crosby, guardian of Elizabeth Bates, and bond executed in the penalty of $6000, conditioned for the faithful performance of his duties.

*Eighth.* The record of the proceedings of the Circuit Court of Madison county, in the suit entitled,

" Betsey Bates, by Levi Crosby, ⎫
  her guardian and next friend, ⎬ *On scire facias.*
        *v.* ⎪
  Joseph Meacham." ⎭

A motion therein entered, " by her attorney," for an alias *sci. fa.* at the September term, 1821.

*Ninth.* The following order to the clerk of the Court, filed September 18th, 1821, namely: " To Mr. Joseph Conway, Clerk of the Circuit Court: Sir—You are hereby required to stop all proceedings in a suit brought, or about to be brought, in my name, on account of a certain bond or mortgage given by Joseph Meacham to John Bates, the same being arranged by Charles W. Hunter and myself.
" LEVI CROSBY,   [L. S.]
" Guardian of the infant heir of John Bates, deceased."

*Tenth.* The sheriff's deed to Crosby, reciting the suit of " Betsey Bates, by Levi Crosby, her guardian," dated July 27th, 1822.

*Eleventh.* The deposition of Abel Moore, showing that he was appointed administrator of John Bates, to succeed one Vaughan, who had succeeded said Crosby, and that no papers ever came into his possession as such administrator, showing that Crosby ever paid any money to Betsey, on account of the tract of land in controversy. He states that Crosby could not have paid the one-tenth part of $1000, out of his own funds; that he had the possession of his father's property, when any claims came against his father; he does not think that the whole of the property belonging to all the Crosbys, would exceed $300 in value, up to the time when Levi Crosby administered on the estate of John Bates; after that, all the Crosbys dressed better than they did before. He also states that Crosby commenced acting as guardian for Betsey, about the year 1822, or 1823, on the death of her mother, Nancy Bates, and thinks that Betsey was at that time about six years old.

*Twelfth.* The deposition of Willis Gray, who states that he was at the sale of the land in controversy, and was surprised that a man of Crosby's appearance, should bid off property to that amount.

*Thirteenth.*   The deposition of Levi McNeil, who states that in the fall of 1819, or 1820, Crosby was in very low circumstances, and not able at that time to pay $50 ; that he had a pork demand on him for $10, which he did not collect of him, but might have done it, if he had taken the legal steps in the proper time.   On cross-examination, he says he knows nothing of Crosby's pecuniary circumstances after that time.

*Fourteenth.*   The deposition of Jacob Deek, who states that Crosby's circumstances, at the death of Bates, were such that he could not, with his own funds, have purchased property to the amount of $100 ; they were such that any stranger coming into the neighborhood, could easily have ascertained what they were.

*Fifteenth.*   The deposition of William Montgomery, who states that the circumstances of Levi Crosby, at the time of the sale of the land by virtue of an execution against Joseph Meacham, and before and after that time, up to his death, were such that he could not have purchased the property with his own money.

*Sixteenth.*   The deposition of Joseph Bartlett, who states that from 1811 to 1816, Crosby was poor, and in very low circumstances, and could not have raised the money to purchase $100 worth of property.

*Seventeenth.*   The deposition of Solomon Pruitt, stating that he knew Crosby; he was very poor previous to the death of Bates ; before that time had scarcely clothes sufficient to clothe himself with, and bought Bates' wearing apparel, at the sale of his personal property, after which, his circumstances mended ; does not know of Crosby's having any property of his own ; claimed his father's property ; knew Levi Crosby up to the time of his death, and during any part of the time he knew him, should not think he could have raised $100 of his own money.

*Eighteenth.*   The deed from the sheriff to Crosby, reciting the suit to be in the name of Betsey Bates, by Levi Crosby, her guardian.   The deposition of William Montgomery, which states that Scott resided in the neighborhood of Crosby, about the time of the sale of the property, and acted as constable and deputy sheriff of Madison county, about the same time, and should suppose knew Crosby's circumstances ; and that it was generally believed in the neighborhood, that the property was purchased with money belonging to the estate of John Bates.   The deposition of Abel Moore, which states that he was pretty well aware that Scott knew Levi Crosby ; that Scott acted as deputy sheriff of Madison county, in the year 1819, and thinks he was well acquainted with Crosby ; his impression is that Scott knew all the circumstances connected with the sale of the land under the mortgage, but will not state positively that such is the fact.   On cross-examination, he says, his impression is that Scott resided in Greene county, at the time of the sale of the land by the sheriff.   The deposition of Levi McNeil, stating that he often heard Scott talk about the title to the

land called Hunter's town; his impression is that Scott would not purchase property unless he thought the title was good; that he was a man of penetrating mind, and used to make enquiries into any business he entered into. On his cross-examination, he says that he has not known of Scott's dealing in disputed titles, except in the present case, and that he did not believe that he would have purchased the land, unless he thought he would profit by it, make by it; he further states, in answer to a question put by the complainant, that some time last winter, Scott came to his house, and they had a conversation respecting the title to this land; the amount of the conversation was, that he was doubtful of the title to the land, but that the deed he got from Fears was the better title. The deposition of Solomon Pruitt, which states that Scott lived in the neighborhood, and that Pruitt is of opinion that he knew all about the circumstances connected with the sale of the land; he had a conversation with Scott, in the winter of 1839–40, when Scott said there was a *devil* of a contest, or some words to that effect, and if he was a single man, he would go and marry Betsey, and then he would be sure of the land. He said he had bought the title of Fears, and thought that title was the best chance. On cross-examination, he says, Scott thought his chance under the Crosby title was as good as any of them. The paper marked (A), as an exhibit, is shown to Abel Moore, one of the witnesses, who states that he believes Scott executed it; it was handed to him by Charles W. Hunter, who told him so; that paper is as follows:

"200. *Winchester, April 25th*, 1836.

"I hereby promise to pay, or cause to be paid, to Abel Moore, in trust for the use of the infant son of Elizabeth, wife of Pleasant Fears, two hundred dollars, so soon as I shall obtain the legal title to a certain tract of land conveyed to me by Pleasant Fears, from the legal representatives of the estate of John Bates, late of Madison county, Illinois, deceased, either by suit or compromise; the said note being a part of the consideration thereof. Witness my hand and seal. JOHN W. SCOTT."

*Nineteenth.* The certificate of the probate justice of Madison county, showing that no settlement had ever been made, or account rendered, by Crosby, as guardian of the complainant Betsey.

This was all the testimony introduced by the complainant to prove the facts not admitted by the answer, such as title in Bates; his seizen and death; the heirship of complainant Betsey; guardianship of Crosby; that the funds of his ward were used for the purchase; and that Scott had notice of the manner in which Crosby purchased; and of his want of means to purchase.

The defendant introduced as evidence, without objection:

*First.* A patent from the United States to Rufus Easton, dated June 16, 1820, reciting that he had, as assignee of Andy Dunne-

gan, deposited in the General Land Office the final certificate of full payment for the land in question, and that the same is granted to him, &c.

*Second.* The appointment and bond of Nancy Bates and R. Langworthy, as administrators of John Bates, deceased, dated December 1st, 1818.

*Third.* The receipt of Nancy Bates, as administratrix, to her co-administrator Langworthy, dated August 17th, 1819, for the notes belonging to the estate of John Bates, amounting, with two of the Meacham notes, to $2223.90.

*Fourth.* The will of Nancy Bates, dated February 28th, 1820, in which she bequeaths all her part of the estate to Levi Crosby, with all its profits and emoluments, together with her stock of cattle, sheep, &c., and to her brother, Levi Crosby, her two horses, in addition to the above stock.

*Fifth.* The letters of administration granted to Crosby, on the estate of Nancy Bates, and the bond, dated on the 11th of March, 1820.

*Sixth.* The letters of administration to Crosby, on the estate of John Bates, and bond, dated September 17th, 1821, in the penalty of $6000, conditioned, &c.

*Seventh.* The proceedings under the *scire facias*, and the judgment entered at the April term, 1822, for $3529.38, in the name of Betsey Bates, by Levi Crosby, her guardian and next friend.

*Eighth.* The sale by the sheriff on the *levari facias*, and the deed to Crosby, dated July 27th, 1822.

*Ninth.* Grant of administration on Crosby's estate to Isaac Gilham.

*Tenth.* The deed from Crosby's heirs to himself, for the premises in question, for the consideration expressed, of $500.

On the proofs and exhibits in the cause, the Circuit Court rendered a *pro forma* decree, that the defendant execute to the complainant, Betsey, a deed conveying all the right, title, and interest which the said Scott acquired, by virtue of the conveyance from the heirs of Crosby, to the land in controversy, within one month after entering the decree, and that a commissioner be appointed for that purpose, in case of Scott's failure to make the deed, and that he pay the costs to be taxed.

From this decree an appeal was prayed, and allowed to the defendant, who has brought the record into this Court, and has assigned, besides the general errors, the following:

*First.* That as the mortgage from Meacham was forfeited after the death of John Bates, to whom Crosby was administrator, and by the forfeiture it became personal property, and went to him, as such administrator, and he having purchased the same, it became his property, which his heirs could sell to the defendant, and therefore it was error to decree Scott to convey to the complainant;

*Second.* That as the proof shows that John Bates never had any legal or equitable title to the land, therefore it was error to decree it to the complainant;

*Third.* That as the proof shows that Scott was a purchaser, for a full and valuable consideration, without any notice that Crosby was dealing with the real estate belonging to the heirs of John Bates, or that Crosby was trustee for the said Betsey, in the capacity of guardian, or that Crosby had purchased the land with the money of the said Betsey, it was error to decree the title which the defendant purchased of the heirs of Crosby, out of him;

*Fourth.* That as the mortgage was personal property, and formed no part of the real estate of John Bates, his heir had no title to it, and consequently the decree is erroneous;

*Fifth.* That as it appears from the exhibits in the cause, that Crosby had a legal interest in one third of the mortgage, by the will of Nancy Bates, it was error to decree all the interest acquired by the deed from Crosby's heirs to the complainant.

At the threshhold of the cause, an objection is taken by the defendant, which, if well founded, must prove fatal to the decree. He insists that as he has shown title in the premises to exist out of either of the contending parties, to wit, in Rufus Easton, by patent from the United States, he must necessarily be made a party, as his rights, or the rights of those claiming under him, may be affected by the decree. When the object and scope of the bill filed by the complainant is considered, this objection will be found not to be sustainable. The bill does not seek any recovery against Easton, or propose to try equities with him, or with any person claiming under him, but its object is to remove an existing impediment out of the way of the complainant, created by the deed from Crosby's heirs to the defendant, so that the title, whatever it may be, acquired under that deed, shall not be used to defeat the complainant, in the further assertion and prosecution of her rights against others.

It is the peculiar province of a court of equity, to administer to the ends of justice, by removing impediments to the fair decision of a question in other courts, by preventing injury to persons from the doubtful title of others, which may be set up, and to prevent an unnecessary multiplicity of suits. (1) The rights of Easton, or of any other person but Scott, cannot be in any way affected by a decree between the complainant and Scott; nor is it necessary to a full and ample award of justice between them, that Easton's rights should be regarded by the Court. Nothing is shown in the case by which it can be inferred that Scott reposes upon Easton's title; it is not so stated in his answer, nor is the fact that Easton has a patent, connected in any way with the case.

As a general rule in equity, it is admitted that all persons mate-

(1) Mitf. Plead. 4.

rially interested in the subject of the suit, however numerous, ought to be parties, that there may be a complete decree between all parties having material interests.   Testing this. proceeding by this rule, we may ask, how is the interest of Easton shown here?   In the subject matter of this suit, neither he, nor his grantees, if there be any, have any interest, nor can it make any difference to them whichever way this controversy may terminate.   The complaint is, that the defendant has unjustly possessed himself of rights which belong to the complainant, and with notice of her rights, not derived from Easton, or any one of his grantees.   This general rule should be, and is confined to parties to the interest involved in the issue, and who must necessarily be affected by the decree.   It is, besides, more a rule of convenience than of right, and is dispensed with when it becomes extremely difficult or inconvenient to pursue. it. (1)

The land claimed by the complainant, as being conveyed to Scott, may be supposed to have been sold by Easton to a thousand different persons or more, who may be in possession under his patent.   The difficulty and inconvenience, therefore, in making them parties, is obvious, and as their interests cannot be affected, in adjusting the equities between the complainant and Scott, no reason can be perceived why he or they should be parties.   Easton and his grantees claim also under a title paramount to that set forth in the bill, and ought not to be made parties, in order to bring into contest rights claimed under such a paramount title. (2)

The reason of this is apparent, as the relief sought by the bill, in this case, cannot affect the rights acquired by them under the patent, nor could a decree be had against them.

It is said, however; that the complainant, in her bill, alleges that Charles W. Hunter is in possession, and that she is about to bring actions at law to eject him, and, therefore, he ought to be made a party.   To this it may be replied, that it is nowhere shown in the cause, that Hunter is in possession under Scott's title, or has any connexion with it.   His title may be paramount to the one derived from Crosby's heirs, and can in no way be touched by a decree between these parties.   Should it be supposed that the decree, as rendered, might, by possibility, affect him, this Court can so modify it as to prevent such a consequence. .

We will now proceed to the other points raised by the appellant, on which the errors are assigned.   He insists that he made the purchase from the heirs of Crosby, for a full and valuable consideration, without stating in his answer what that consideration was, and how much.   The quitclaim deed, executed to him, purports to have been made for the consideration of $500.   He is called upon by the bill to state, specifically, what the consideration was, and evasively answers, that it was for a full and valuable con-

(1) 11 Vesey 429; 1 Johns. Ch. R. 349.          (2) Story's Eq. Plead. 198.

Scott *v.* Moore *et al.*

sideration. It is manifest, then, that the sum of $500 was inserted more for convenience and form, than any thing else, and was not, in fact, paid by the defendant, for if it was paid by him, he would most certainly have so answered when interrogated upon that point.

He also insists that the mortgage by Meacham to Bates was forfeited after the death of Bates, to whom Crosby was administrator, and that on such forfeiture, it became personal property, and passed to the administrator, and judgment being obtained on it, Crosby had a right to buy in the land in his own name.

The mortgage executed by Meacham to Bates was a mortgage in fee, and upon forfeiture, the complainant, as heir at law, might have brought her action of ejectment to recover the possession. The proofs in the cause show, that at the time of the forfeiture, she was a mere infant, not more than six years of age, and therefore not having a legal competency to assert her rights, Crosby was her uncle and legal guardian, and by him she could alone act. It was for him to determine, by an honest exercise of his judgment, as guardian, what course would best promote the interests of his ward. The land was sold to Meacham for $3900, the greater part of which was due when the forfeiture occurred. By the action of ejectment, the heir, the complainant, would be put in possession of the estate ; by a suit to foreclose and sell, a great loss might fall upon the heir, the avails depending upon the sale, and it is shown in the cause, that at the time of the sale, the land was valued at $2990, and bought by her guardian, in his own name, for $1000. The law in force at that time (1) authorized the heir, executor, or administrator of the mortgagee to sue out a *scire facias.* The proceedings in that suit show that Crosby did not treat the mortgage as belonging to him, as administrator of John Bates, for he instituted the suit in the name of Betsey Bates, the complainant here, by himself, as her guardian and next friend.

Admitting the principle to be correct, that a forfeited mortgage becomes personal property, it is *sub modo* only. If the heir chooses to bring an ejectment, he may do so, the legal estate being vested in him, and it is, as to him, real property. If the administrator acts upon it by commencing proceedings in his name, he may convert the funds into assets with which to pay debts, and if the creditors of Bates were claiming, they might be considered as entitled to have the mortgage declared assets for their benefit.

In this case, nothing was done by Crosby, as administrator of Bates, in reference to the mortgaged property. He took no steps to convert it into assets, but brought the action in the name of the heir, by himself, as her guardian and next friend. This fact of itself is sufficient to destroy the idea that the mortgage, proceeded on as it was by Crosby, in the name of the heir, in the Circuit Court of Madison county, was really a chattel belonging to him as

(1) Laws of 1819, 178-9.

administrator. He did not so treat it, and it is not for him, or those claiming under him, now to set up such a claim; they are estopped by his proceedings in the case.

The act of 1819, authorizing the heir to bring the *scire facias*, is a recognition of the right of the heir to the mortgage, and so Crosby himself seems to have considered it, by taking steps in the name of the heir. The heir has such an interest as to entitle her to maintain an action for condition broken, by this statute.

The second error assigned proceeds upon the ground that the patent to Easton shows that Bates never had a legal or equitable title to the land. Independent of the patent, which is read in evidence, without being connected in any way with the case made by the complainant and the defendant, or either of them, the complainant, we apprehend, has made out a legal and an equitable title as against the defendant.

Our statute makes the certificate of the register of the land office of the entry and purchase of a tract of land, evidence in an action of ejectment, and it will prevail unless a better legal and paramount title is exhibited. The certificate produced on the hearing shows that on the 19th of August, 1814, Andy Dunnegan bought and paid for the land, and in October, of the same year, sold and conveyed it to John Bates, by deed of general warranty, duly acknowledged and recorded; and it appears that Bates died on the land, and that the complainant is his only heir at law.

Suppose the complainant was litigating her claim with Easton himself, who claims under the patent. In a court of law, she would necessarily be defeated by the patent, that being a title paramount to her certificate of entry by Andy Dunnegan. In a court of equity, she might, by her superior equity, being the assignee of Dunnegan, defeat the title of Easton under the patent. She might show that the patent was obtained in fraud of her rights; that she had the prior equity; and was therefore entitled to the legal estate. But those matters cannot be contested or decided upon in this suit. It is sufficient, for this case, that the complainant has shown an equitable title, and it cannot be permitted, in a court of equity, that it shall be defeated by an outstanding legal title in a stranger to the suit. So far as the rights of the complainant and Scott are concerned, the title of Easton cannot vary them. When that title is attacked, it will be time to consider its force. The only question now before us is, has an existing equity been shown, on the part of the complainant, as against the defendant, so preponderating on her side as to call into action the power of a court of equity.

As to the third special assignment of error, that Scott was a purchaser for a valuable consideration, without notice that Crosby was dealing with real estate belonging to the heir of John Bates, or that he was a trustee for the heir, in his capacity of guardian, or that Crosby had purchased the land with the money of his ward, we

apprehend it is not essential to go any farther back to show notice to Scott, that Crosby was dealing with real estate which he considered to belong to the heir of Bates, than to the deed to Crosby from the sheriff, which is the foundation of his title.

It is impossible to believe that Scott should have made the purchase of the heirs of Crosby, even for a nominal consideration, without inspecting the title under which they claimed. The deed from the sheriff was of record in the proper county, and it recites the fact, that the proceedings under which the sale was made to Crosby, were upon a *scire facias* issued in the name of Betsey Bates, as heir at law of her father, John Bates. This was notice to Scott of that fact. The same proceedings also informed him that Crosby was the guardian of the complainant, and as such, her trustee of the avails of those proceedings, whether the land itself, or money in lieu thereof. There is no direct evidence, upon the other branch of this assignment of error, that Scott had notice that Crosby had purchased the land with the money of the complainant, yet all the testimony conspires to show, that he was placed in such a situation in regard to Crosby, as to render it very improbable that he did not know the utter want of ability on the part of Crosby to make such a purchase, with his own means. He was living in Crosby's neighborhood; was a constable and deputy sheriff of the county, not long before the sale and purchase of the land, and considering the small number of inhabitants in the county at that day, it is next to impossible that Scott should not have known enough to satisfy him, when he read the deed from the sheriff to Crosby, for the consideration of $1000, that other money, besides his own, was used to make the purchase with. The witnesses all state that Crosby, up to Bates' death, was not good for $100 ; that he had scarcely clothes enough to wear ; that any stranger coming into his neighborhood could at once see his situation.

The fourth special assignment of error proceeds upon the principle heretofore briefly examined, that the mortgage was personal property, and formed no part of the real estate of John Bates, deceased. This may be so under certain circumstances, and for the reason given in the books, that a mortgage is to be considered personal estate, because the money to secure which the mortgage is given, is originally parted with from the personal estate of the mortgagee, and would come immediately into the hands of the executor or administrator, had it not been placed out on real estate securities. This reason, however, would not hold good in this case, as the facts show that the mortgage was not given for money lent, or for any thing issuing out of the personalty, but to secure the payment of the purchase money for the fee in the land, which, without the sale, would have descended to the heir at law, on the death of the ancestor, Bates. If the reason of the doctrine of the books does not apply to this case, the doctrine itself should not be encouraged; but, as it does not determine the case either way, we will con-

sider the point presented as clear, that the mortgage was a chattel
which passed to the administrator, and the heir but a trustee for
him, as to the legal estate in the land; then it follows necessarily,
that the administrator is a trustee for the next of kin, as to the ulti-
mate beneficial interest in the mortgage money. Crosby, then, being
in this aspect of the case, the trustee for the complainant, who is
shown to be the next of kin, having purchased the land with the
money which belonged to her, as such next of kin, and there being
no creditors, could have been compelled in equity, to convey the
land thus purchased with her money. A resulting trust was created,
which could be enforced, and with greater propriety in this case, as
he acted as her legal guardian, and was bound by every considera-
tion of law, honor, and justice, to protect and defend her rights and
interests.

The last assignment of error questions the propriety of the de-
crée, on the ground that the proofs show that Crosby, under the will
of Nancy Bates, the mother of the complainant, was entitled to one-
third of the proceeds of the mortgage, in her right, and therefore the
whole of the land should not have been decreed to complainant.

. The will of Nancy Bates relied on is very uncertain as to what
estate she devised to Crosby. The words are, " I bequeath all my
part of the estate to Levi Crosby, with all its profits and emolu-
ments, together with my stock of five cows, &c."

Whether this bequest has any relation to the proceeds of the
mortgage, is very doubtful, to say the least; but one thing is certain,
Crosby himself did not so consider it, as two years afterwards, as
guardian of the complainant, he instituted proceedings by *scire
facias*, in her name, to acquire for her the avails of it. He and
those claiming under him are now estopped from making such a
claim under such circumstances.

There is, however, an objection taken to the will itself, as not
having been proved in conformity with the statute. The act of
1819, under which it was made, declares (1) " That estates may
be devised or bequeathed by will, and all wills and codicils in
writing, by which any lands, &c., goods, or chattels are devised,
shall be signed by the testator, and witnessed in the presence of
the testator, by two or more credible witnesses, two of whom de-
claring on oath or affirmation, before the court of county commis-
sioners for the county, that they were present, and saw the testator
sign said will or codicil, in presence of the other witness or wit-
nesses, if any there were, and that they believed the testator to be
of sound mind, memory, and judgment, at the time of signing the
same, shall be legal proof of the execution of said will or codicil."

The proof made before the court by the two witnesses to the
will, is to this effect, " that they were present and saw the said
testator sign said will and the codicil thereto annexed, and that they

(1) Laws of 1819, 231.

Scott v. Moore et al.

believed her to be of sound mind, &c.," as in the statute. The witnesses omit to state the signing in the words of the statute; but it is not necessary to invalidate the will on that account. It may be considered a substantial compliance with the act.

The claim now attempted to be set up, under this will, ought not to be allowed to avail he defendant, claiming, as he does, under Crosby, for these reasons. The proofs in the cause show that Crosby stood to the complainant in the two-fold relation of uncle and guardian; guardian by her mother's testament, and by the appointment of the proper court. That a large estate was left, to which she was the only heir; that her guardian used it for his own purposes, never having accounted to the court, or in any other way, for the proceeds, thus betraying a trust of the most sacred nature, and leaving her, an infant, to the cold charities of an unfeeling world. For him, if living, now to claim in a court of equity, any portion of the estate under such circumstances, and have it allowed to him, would be inconsistent with the beneficent office such a court is designed to perform, and at war with its high attributes.

Upon a review of all the facts of the case, as admitted in the answer, and as proved by the testimony and exhibits in the cause, we are satisfied that the complainant has shown,

*First.* A legal and an equitable title as against the defendant;

*Second.* That Crosby was her guardian, and, as such, bound to protect her interests;

*Third.* That he availed himself of the advantages of his situation, as guardian, and administrator of her father, to appropriate her estate to his use;

*Fourth.* That the defendant was in a position to know all the material facts attending the purchase of the land by Crosby, and made his purchase of the heirs of Crosby, under circumstances sufficient to make him chargeable with notice. His declaration that the title of Fears, a former husband of the complainant, was the better title; his making the note for $200, in trust for the benefit of the child of the complainant, at the time he made the purchase of the Crosby title, and refusing to state in his answer what he paid for that title, all concur in showing such a knowledge as must affect him in this suit. The facts are so strong, tending to show this knowledge, as to warrant the belief that he had in fact such knowledge, and he is therefore to be affected by it.

The decree of the Circuit Court is affirmed with costs, and if the deed be not executed by Scott, within thirty days from the entering of this judgment, the commissioner appointed by the Circuit Court shall execute the deed mentioned in the decree.

*Decree affirmed.*